1   Richard A. Stavin, Esq. - SBN 139403
    STAVIN & ASSOCIATES
2   21031 Ventura Boulevard, 12th Floor
    Woodland Hills, California   91364
3   Tel:  (818) 348-8464; Fax: (818) 348-8465
    E-Mail:      richard@stavinlaw.com
4
    Attorneys for Plaintiff and Counter-
5   Defendant, PROGRESSIVE CASUALTY
    INSURANCE COMPANY
6

7                   UNITED STATES DISTRICT COURT
8       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
9

10  PROGRESSIVE CASUALTY            )   CASE NO.  CV 08-1396 R (RZx)
11  INSURANCE COMPANY, an Ohio      )
    Corporation,                    )
12                                  )   **STATEMENT OF
                                    )   UNCONTROVERTED FACTS AND
13              Plaintiff,          )   CONCLUSIONS OF LAW
                                    )   [Filed Concurrently With Motion For
14              v.                  )   Summary Judgment]**
                                    )
15                                  )
16  PETER AKARAGIAN and, DOES       )
    1 through 10, inclusive,        )   **Hearing Date:      May 4, 2009
17                                  )   Time:               10:00 a.m.
                Defendants.         )   Courtroom:          8**
18                                  )
    _____ )
19                                  )
    PETER AKARAGIAN,                )
20                                  )
                Counter-Claimant,   )
21                                  )
22              v.                  )
                                    )
23  PROGRESSIVE CASUALTY            )
    INSURANCE COMPANY, and          )
24  DOES 1 through 10, inclusive,   )
                                    )
25              Counter-Defendants. )
    _____ )
26

27

28

C:\Temp\notesFFF692\REAL.STATEMENT.Uncontroverted Facts.wpd

SEPARATE STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

After consideration of the papers in support of and in opposition to Plaintiff, Progressive Casualty Insurance Company's, motion for **summary judgment** and the oral argument of counsel, the Court Determines that the following **facts** have been established as, **UNCONTROVERTED FACTS:**

1.     Plaintiff, Progressive Casualty Insurance Company was, and is, an Ohio corporation with its principal place of business in Mayfield, Ohio at all material times mentioned herein.

> (Declaration of Maria Kawecki (hereinafter Kawecki Declaration"), page 2, lines 9-11.)

2.     Defendant and Counter-Claimant, Peter Akaragian (hereinafter Akaragian"), was and is a resident of the State of California, County of Los Angeles at all material times mentioned herein.

> (Kawecki Declaration, page 2, paragraphs 2 and 6 and Exhibit A attached thereto.)

3.     On or about August 28, 2006, Defendant purchased a 1997 21 foot Schiada River Tunnel boat and tandem trailer (hereinafter the "boat").

> (Kawecki Declaration, page 2, paragraphs 4 and 6 and Exhibit A attached thereto; Deposition of Akaragian, page 23, lines 20-24 attached to the Stavin Declaration.)

4.     On or about August 31, 2006, Akaragian caused to be submitted an application for insurance with Progressive Casualty Insurance Company through Progressive Direct Insurance Co.  Akaragian signed the application on or about September 8, 2006.

> (Kawecki Declaration, page 2, paragraph 5.)

5.     In reliance on the information set forth in the application, Progressive Casualty Insurance Company caused to be issued a policy of insurance bearing policy no. 14168504-0 with an effective date of August 31, 2006 for a 12 month term insuring a boat described as a 21 foot Schiada bearing hull identification number

C:\Temp\notesFFF692\REAL.STATEMENT.Uncontroverted Facts.wpd

SEPARATE STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

SMORT238C797.  Coverage under Part IV of the insurance policy entitled **PHYSICAL DAMAGE COVERAGE** "does not apply to any **loss**:

> 10. that is due and confined to:
>
> > a.  wear and tear;
> >
> > e.  mechanical or structural breakdown;"

(Kawecki Declaration, page 2, paragraph 6 and Exhibit A attached thereto and page 4, paragraph 13 and the pertinent section of the policy set forth above attached as Exhibit B.)

6.      As reported by Akaragian, in and around August 8, 2007, while using the boat on Lake Meade, Akaragian sustained damage to the boat, including its engine.  The loss was reported to Progressive Casualty on or about August 16, 2007.

(Kawecki Declaration, pages 2-3, paragraph 7.)

7.      Akaragian reported that the boat was running at speed and struck a submerged object causing the engine to race or rev up and then stall. Attempts to re-start the engine failed.

(Kawecki Declaration, page 3, paragraph 8 and Exhibit B attached thereto.)

8.      Henry Sahagian had been to Lake Mead, where the incident took place, using his own boat 50 to 60 times before the incident and had never had a problem running aground.

(Stavin Declaration, page 2, paragraph 4  and the attached excerpts from the Sahagian Deposition, page 36, lines 11-18.)

9.      Prior to the incident on Lake Mead resulting in this claim, Akaragian had only used the boat 3 or 4 times before on Lake Castaic where the top speed limit was 35mph.  On these occasions, Akaragian never drove the boat at 35 mphs for more than a minute or two.

(Stavin Declaration, page 2 paragraph 6 and the attached excerpts from the Akaragian Deposition, page 28, lines 5-13.)

C:\Temp\notesFFF692\REAL.STATEMENT.Uncontroverted Facts.wpd

SEPARATE STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

10.     Lake Mead does not have a posted speed limit and speed are only controlled in and around the marina area where the posted limit is 5mph and swimming zones.

> (Stavin Declaration, page 2, paragraphs 4 and 6 and the attached excerpts from the Akaragian Deposition, pages 28-29, lines 24-2 and the Deposition of Henry Sahagian, page 29, lines 8-16.)

11.     The incident on Lake Mead resulting in this claim happened on the second day of the trip and the boat had been used for 3 to 4 hours the day before the incident.

> (Stavin Declaration, page 2, paragraph 6 and the attached excerpts from the Akaragian Deposition, page 29, lines 3-5.)

12.     On the first day of the trip to Lake Mead, Akagarian drove the boat at speeds between 40 and 45 mph or 35 to 40 mph for 10 to15 minutes each time.

> (Stavin Declaration, page 2, paragraphs 4 and 6 and the attached excerpts from the Sahagian Deposition, page 38, lines 10-21 and the Akaragian Deposition, page 29, lines 3-18.)

13.     The incident took place on the second day of the trip after being out on the water for approximately 6 hours and making several stops at various locations. As they traveled from location to location, Akaragian drove the boat on a number of occasions at a top speed of 40 to 45 mph for periods of time ranging from 20 to minutes.

> (Stavin Declaration, page 2, paragraphs 4 and 5and the attached excerpts from the Sahagian Deposition, pages 42-44, lines 23-23 and pages 50-51, lines 17-4 and the Deposition of Ara Akaragian (hereinafter "A. Akaragian"), page 21, lines 20-23.)

14.     At the time of the incident, Akaragian had been traveling at around 35 mph for approximately 10 minutes.

> (Stavin Declaration, page 2, paragraph 6 and the attached excerpts from

C:\Temp\notesFFF692\REAL.STATEMENT.Uncontroverted Facts.wpd

SEPARATE STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

4

1    the Akaragian Deposition, page 36, lines 6-16.)

2    15.    The first indication that there was a problem was when something

3    happened that was referred to as a clunk, a thud or hitting a speed bump.  Prior to this

4    nothing was observed in the water as the boat traveled forward.  Visibility in the water

5    was very good.   No one said anything immediately before the incident occurred.

6    Akaragian had a clear and unobstructed view in front of him, had no problems with

7    his eyes and was wearing his glasses and had a correct prescription.

8            (Stavin Declaration, page 2, paragraphs 4-6 and the attached excerpts

9            from the Depositions of Akaragian, pages 37-38, lines 11-8, Sahagian,

10           pages 52-53, lines 22-10 and page 55, lines 4-6 and A. Akaragian, page

11           23, lines 21-23.)

12   16.    Immediately after the clunk, thud and/or speed bump feeling, no one saw

13   anything in or on the water or made any comments that they did see anything in the

14   water.

15           (Stavin Declaration, page 2, paragraphs 4-6and the attached excerpts

16           from the Depositions of Sahagian, page 53, lines 11-16, A. Akaragian,

17           page 25, lines 3-14 and Akaragian, page 40, lines 3-12 and page 50,lines

18           6-7.)

19   17.    The incident happened in the middle of Lake Mead about 6 to 8 miles

20   from each shore line and the water was deep.

21           (Stavin Declaration, page 2, paragraphs 4-6 and the attached excerpts

22           from the Akaragian Deposition, page 34, lines 9-11, page 39, lines 19-

23           24, pages 55-56, lines 15-7, A. Akaragian Deposition, page 27, lines 5-

24           11 and Sahagian Deposition, pages  60-61, lines 22-4.)

25   18.    Henry Sahagian has been to Lake Mead 50 to 60 times on boats he

26   has owned or used, never run aground and thought that the clunk sound was all in the

27   engine and thought it had something to do with the engine, although he was not sure.

28           (Stavin Declaration, page 2, paragraph 4 and the attached excerpts from

1    the Sahagian Deposition, pages 58-59, lines 15-1.)

2    19.    On or about August 31, 2007, as part of the claims investigation, the

3    boat, engine and related equipment were inspected by Jim Wilkes of Wilkes Marine

4    acting at the request of and on behalf of Progressive.

5    (Declaration of Jim Wilkes (hereinafter "Wilkes Declaration"), page 2,

6    paragraph 6.)

7    20.    The inspection of the boat and its equipment by Mr. Wilkes

8    demonstrated that the engine had broken a valve causing major piston and head

9    damage and that the drive plate was broken.  Mr. Wilkes also observed that the lower

10   unit of the engine and the propeller did not exhibit any signs or damage supporting a

11   claim that the boat sustained a major impact with a submerged object as alleged by

12   Akaragian.  Moreover, the propeller shaft was observed to be within factory tolerance

13   and showed no signs of vertical shaft twisting.

14   (Wilkes Declaration, page 3, paragraph 7 and his report attached thereto

15   as Exhibit A.)

16   21.    The engine sustained a failure causing a vibration to the drive plate

17   causing it to break from its welds.  The motor dropped the head of the valve and

18   caused the motor.

19   (Wilkes Declaration, page 3, paragraph 8and Exhibit A attached thereto.)

20   22.    Photographs B-1 through B-3 show the lower gear case also known as

21   a bullet.  The 3rd shows Bond-O on the bottom of the skeg and at the beginning of the

22   bullet) are various views of the lower gear case.  The lower gear case is attached to the

23   upper gear housing.  The pink substance observed in 2 of the photos is a substance

24   known as Bond-O.  It appears to have been used to cover up a portion of the gear case

25   that has been sanded down and shows that this part may have been repaired in the past

26   prior to this incident.  The lower gear case shows signs of scuffing by the nose of the

27   bullet and some scuffing above the bullet.  This type of scuffing is from normal wear

28   and tear caused by water erosion while the boat is running at a normal speed.  There

1  is simply no evidence that this part sustained any trauma or impact damage from
2  hitting a submerged object which would have caused the catastrophic engine damage
3  that I observed.

4               (Wilkes Declaration, pages 3-4, paragraph 10 and Exhibits B-1 through
5               B-3 attached thereto.)

6      23.    B-4 and B-5 are photos from different angles showing the propeller that
7  was on the boat     at the time of the incident.  Although difficult to see in the
8  photos, they show  signs of scratches caused by normal wear and tear.  There is
9  absolutely no damage shown anywhere on the propeller that it came in contact with
10  a fixed submerged object.  At the speed the boat was traveling at the time of the
11  incident, according to the deposition testimony, had the propeller hit a fixed
12  submerged object there would have been significant damage to the propeller and none
13  exists.

14               (Wilkes Declaration, page 4, paragraph 11 and Exhibits B-4 and B-5
15               attached thereto.)

16      24.    B-6 is a close up look of one of the blades of the propeller.  The edge
17  towards the bottom of the photo shows that it is a bit blunt and has some scratches on
18  it.  It also shows signs of some debris chips which are often times caused by pulling
19  the boat up to a beach.  Again, this type of damage, if you would like to call it that, is
20  not consistent with the propeller hitting a fixed submerged object.

21               (Wilkes Declaration, page 4, paragraph 12 and Exhibit B-6 attached
22               thereto.)

23      25.    B-7 is a side view of the propeller.  This is a used propeller and shows
24  no signs of impact damage.  There are scratches from normal wear and tear, namely,
25  usage.

26               (Wilkes Declaration, page 4, paragraph 13 and Exhibit B-7 attached
27               thereto.)

28      26.    B-8 is a view of the coupler also known as the drive plate.  The drive

coupler had been repaired prior to this accident as evidenced by the welds.  B-9 is a closer look at the drive plate showing a broken weld at 8 o'clock and a partially broken weld at 11 o'clock.  The weld job was horribly done and the breaks were caused by abuse over time.  B-10 is an even closer view of the welds showing that they had broken off and the lack of workmanship in setting the welds originally.  B-11 shows another poor weld with no corresponding damage to the outdrive which consists of the upper and lower gear case and the propeller.

(Wilkes Declaration, page 5, paragraph 14 and Exhibits B-8 through B-11 attached thereto.)

27.    B-12  shows the coupler/drive plate.  The bottom side of the coupler fits up against the engine.  It was on the boat for some unknown period of time based on the wear and tear it shows.  B-13 shows the bottom of the coupler and significant evidence of additional wear and tear in the form of numerous striations in a from right to left pattern.

(Wilkes Declaration, page 5, paragraph 15 and Exhibits B-12 and B-13 attached thereto.)

28.    B-14 shows 4 (nos. 2,4,6 and 8) of the 8 pistons on the motor on the starboard or right side of the motor.  Piston no. 2 (the second from the right in the photo) shows significant carbon build up which is a sign of long term usage.  There is no evidence of an over speed condition, the race up or rev up so to speak.  There is simply no damage shown in this photo to support that belief.  B-15 is another view of the starboard side of the motor.

(Wilkes Declaration, page 5, paragraph 16 and Exhibits B-14 and B-15 attached thereto.)

29.    B-16 and B-17 show the port or left side of the engine and contain piston nos. 1, 3, 5 and 7 counting from right to left.  No. 1 was the valve that was dropped causing the damage.  It has marks all over it showing the extensive damage.  The other pistons are all in various stages of failure.  The no. 7 piston on the far right

C:\Temp\notesFFF692\REAL.STATEMENT.Uncontroverted Facts.wpd

SEPARATE STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

1   of the photo shows signs that it is trying to blow out carbon.  In B-18 the head gaskets

2   are leaking on nos. 1 and 3.  B-19 is a close up of piston no. 5 and shows some

3   leakage.  This shows that the engine is not a new engine and shows considerable

4   usage.  This boat and engine prior to Mr. Akaragian's purchase was built in 1997 with

5   a turbo-charged high performance engine.  The running time on this engine was high

6   as evidenced by my comments above.  Running it on Lake Mead at speeds and higher

7   rpms, and for the amount of the length of time in each instance which Mr. Akaragian

8   had never run the boat at before is the most likely cause of the engine failure.

9           (Wilkes Declaration, pages 4-5, paragraph 17 and Exhibits B-16 through

10          B-19 attached thereto.)

11      30.    B-20 shows pieces of the exhaust valve.  This damage was caused by the

12  increased rpm.    It is my understanding from the deposition testimony of the

13  individuals on the boat that no one heard the engine rev up prior to the engine damage.

14  Neither the photos nor my inspection showed any damage to the pistons that would

15  indicate a high rpm condition caused by a revving up of the engine.

16          (Wilkes Declaration, page 5, paragraph 18 and Exhibit B-20 attached

17          thereto.)

18      31.    Neither the boat nor its engine or outdrive hit a fixed and submerged

19  object or any object for that matter which caused these damages.  The damages were

20  caused by wear and tear and/or a mechanical breakdown.

21          (Wilkes Declaration, page 5, paragraph 19; Stavin Declaration, page 2,

22  paragraphs 4-6 and the attached excerpts from the deposition testimony of Peter

23  Akaragian, Henry Sahagian and Ara Akaragian.

24      Based on the foregoing **Uncontroverted Facts**, the Court now makes its,

25                          **CONCLUSIONS OF LAW**

26      1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C.

27  §1333(1) as the action arises out of or related to an insurance policy covering a water

28  vessel.  Venue is proper pursuant to U.S.C. §1391(b)(2) as the defendant resides in

C:\Temp\notesFFF692\REAL.STATEMENT.Uncontroverted Facts.wpd

this District..

2.      The damage to Defendant Akaragian's boat was not caused by hitting a submerged object, but was caused by a mechanical breakdown.

3.      Progressive Casualty Insurance Company insurance policy bearing policy no. 14168504-0 with an effective date of August 31, 2006 for a 12 month term states that Coverage under Part IV of the insurance policy entitled **PHYSICAL DAMAGE COVERAGE** "does not apply to any **loss**:

          10. that is due and confined to:

          a.  wear and tear;

          e.  mechanical or structural breakdown;"

4.      Since the physical damage to the engine was caused by a mechanical breakdown it is the determination of this Court that there is no coverage under the insurance policy for the damages stated.

5.      Further, since there is no coverage for the loss, there can be no breach of contract as alleged in Akaragian's Counter-Claim rendering said Counter-Claim moot.

6.      Judgment shall be entered in Plaintiff Progressive Casualty Insurance Company's favor consistent herewith.

The Court has read and adopted these facts as having evidentiary support.(R)

Dated: May 5, 2009

By: _____
The Honorable Manuel L. Real
United States District Judge

C:\Temp\notesFFF692\REAL.STATEMENT.Uncontroverted Facts.wpd

SEPARATE STATEMENT OF UNCONTROVERTED FACTS
AND CONCLUSIONS OF LAW

1

## **CERTIFICATE OF SERVICE**

2   The undersigned hereby certifies that a true and correct copy of the above forgoing

3   document has been served on May 4, 2009 to all counsel of record who are deemed

4   to have consented to electronic service via the Court's CM/ECF system per Civil

5   Local Rule 5.4.   Any other counsel of record will be served by electronic mail,

6   facsimile and/or overnight delivery.

7

8            .

_____
9            Richard A. Stavin
            rich@stavinlaw.com

10          Attorneys for Plaintiff and Counter-Defendant
            Progressive Casualty Insurance Company

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28